Jeanette **DOOLEY**, Plaintiff,

v.

**CITY OF PHILADELPHIA, Police Department of the City of Philadelphia, John F. Timoney, Richard Zappile, Robert Small, John Norris, Defendants.**

No. CIV.A. 99–2764.

United States District Court, E.D. Pennsylvania.

June 6, 2001.

634

Steven M. Coren, John W. Morris, Kaufman, Coren & Ress, Philadelphia, PA, for Plaintiff.

Mark J. Foley, Jessamyne M. Simon, George A. Voegele, Jr., Klett, Lieber, Rooney & Schorling, Philadelphia, PA, for Defendants.

### *MEMORANDUM*

LOWELL A. REED, Jr., Senior District Judge.

■ Plaintiff Jeanette Dooley, a captain in the Philadelphia Police Department, claims that she was suspended, transferred, and effectively demoted because her testimony at a criminal trial irked her superiors. She brings this action under 42 U.S.C. §§ 1983, 1985, and 1986, alleging that the actions taken against her by the police department and its officials violated her constitutional right to freedom of expression secured by the First and Fourteenth Amendments to the United States Constitution. She also asserts a number of state-law claims. Dooley now moves for partial summary judgment on liability, and the defendants—the City of Philadelphia and individual officials within the Philadelphia Police Department [1]—move for summary judgment on all counts. This Court

---

1. Plaintiff also names the Philadelphia Police Department as a defendant. Defendants correctly note that the Philadelphia Police Department is not a proper defendant, because it is not a separate legal entity that can be sued apart from the City of Philadelphia. *See At-kinson v. City of Philadelphia*, No. 99–1541, 2000 WL 295106, *2, 2000 U.S. Dist. LEXIS 3153, at *6 (E.D.Pa. March 20, 2000) (citations omitted). Therefore, plaintiff may not proceed against the Philadelphia Police Department.

has jurisdiction over the case under 28 U.S.C. § 1331, as it includes allegations of violations of federal laws and the Constitution of the United States.

For the reasons explained in this memorandum, I conclude that Dooley was disciplined for engaging in speech protected by the First Amendment, and that she is entitled to summary judgment on liability as to a five-day suspension that, on its face, targeted her speech. There remain genuine issues of material fact as to other adverse actions taken against her by defendants, and those will be sorted out at trial. I also conclude that there is sufficient evidence to suggest that there was a conspiracy to deprive her of her First Amendment rights. And finally, I conclude that a reasonable jury could not find in her favor on her state-law claims. Therefore, the motion of plaintiff for partial summary judgment on liability will be granted in part and denied in part, and the motion of defendants for summary judgment will be granted in part and denied in part.

### Background

At the center of this action is a former police officer named Michael Vassallo. By all accounts, Vassallo was no saint; he was kicked off the police force twice, arrested twice and convicted once for shoplifting, and implicated in a number of violent episodes ranging from physical assault to rape. Jeanette Dooley had supervised Vassallo from June 1991 to February 1996, when she served as captain of the 14th District, located in the Chestnut Hill, Mt. Airy, and Germantown sections of Philadelphia. Vassallo headed up the "Five Squad," an elite unit charged with responding to "priority one" emergencies such as murder, rape, robbery, and aggravated assault. He reported directly to Dooley.

Vassallo was arrested in 1996 for shoplifting.[2] After the arrest, the police department launched an investigation into Vassallo's conduct, and its investigation turned up evidence—including the testimony of two other police officers, John McGrath and Cynthia O'Leary—that Vassallo had severely beaten a criminal suspect in 1993. The investigation was turned over to the Federal Bureau of Investigation, and eventually, criminal charges were brought against Vassallo in federal court for violating the civil rights of the suspect. Dooley appeared and testified as a defense witness in Vassallo's 1998 federal criminal trial.[3]

Dooley was questioned at that trial by counsel for Vassallo, as well as counsel for another defendant, and the Assistant United States Attorney. First, she provided background on herself and the 14th District. She testified that Vassallo "established his reputation as being credibly responsive to the community," as a sergeant in the Five Squad. (Testimony of Jeanette Dooley in *United States v. Vassallo*, Crim. No. 97–577–1–3, Feb. 20, 1998, at 20–25) ("Dooley Trial Testimony"). She testified that she had personal knowledge of bad blood between Vassallo and another member of the Five Squad, John McGrath, who

**2.** The shoplifting arrest took place in October, 1996, while he was still with the "Five Squad." Vassallo was dismissed from the department after the arrest, and eventually convicted. Dooley appeared for the purpose of testifying as a defense witness at Vassallo's retail theft trial, but never testified because her testimony was excluded by the judge as irrelevant. Dooley's appearance at Vassallo's retail theft trial is not at issue in this case.

**3.** Dooley also appeared and testified voluntarily as a character witness at Vassallo's bail hearing on the federal charges. Her testimony during that hearing is not at issue in this case.

was a key witness for the prosecution. (*Id.* at 34.) McGrath had been upset with Vassallo, Dooley testified, because Vassallo had sided against McGrath when a civil rights complaint was filed against McGrath. (*Id.* at 36.)

In the context of being questioned by defense counsel about the tension between Vassallo and McGrath, Dooley had the following exchange with counsel, which is the molten core of this heated dispute:

Q: Were there any other instances of animosity demonstrated between the two of them?

A: Yes.

Q: Let me ask you specifically this, though, are you aware of any instance where there was an escape of a prisoner?

A: Yes.

Q: Tell us what they are?

A: Sergeant Vassallo had complained that Officers McGrath and O'Leary did not properly secure prisoners on a number of occasions.

MR. WZOREK: I'll object to her testifying for Sergeant Vassallo again.

THE COURT: Yes.

Q: Tell us about the escaped prisoners?

A: At the end of '93 or the beginning of 1994, I have to tell you how it came to my attention because I wasn't present. Do you want—I become aware that Officers McGrath and O'Leary had been transporting a prisoner who escaped from the back of the police wagon.

The prisoner was caught within a short period of time, an hour, maybe a little more than an hour. And when I became aware that that had happened, I wanted to know what the circumstances

were and I learned that some of the wagons were not properly equipped with padlocks.

Q: And so, I'm sorry, as a result of that, what did you do?

A: I contacted the inspector of north police division. I also learned that it wasn't just the 14th District, that there were a number of wagons throughout the city that were not properly equipped with padlocks.

Now, of course, the wagons have bolts, you know, which the officers are supposed to secure and most of the officers would then use their handcuffs to go through the lock in place of the missing padlock.

Q: I'm sorry, any other instances of escape?

A: Well, there was one instance where they had stopped a fellow who was wanted for homicide and they, when you stop a car we . . . [Objection colloquy.]

Q: As a result of the fact that homicide suspect was stopped, did the suspect get away?

A: Yeah, the suspect punched Officer McGrath and took off and was caught down the block.

Q: Let me ask you this, specifically as a result of that what, if anything did Sergeant Vassallo say about those two incidents?

MR. WZOREK: Objection.

THE COURT: Sustained.

MR. COGAN: I have no further questions, thank you.

(Dooley Trial Testimony, at 36–38.) [4]

The day after Dooley testified, the jury acquitted Vassallo.

---

**4.** Dooley also testified about the escapes on cross examination, and acknowledged that

she had given McGrath and O'Leary commendations. She also spoke about complaints

Dooley claims that after she testified at Vassallo's federal trial, the defendants took a number of adverse employment actions against her, including an eventual transfer to the "Siberia" of the department, the Command Inspections Bureau or "Night Command," and a 15–day suspension without pay.[5] She alleges in her § 1983 claim that these steps were taken in retaliation against her testimony, which was an exercise of her right to freedom of expression under the First Amendment, and claims that defendants' conduct was part of a conspiracy to violate that right under §§ 1985 and 1986. She also alleges that the defendants' conduct denied her rights protected by the Pennsylvania Constitution, violated a Pennsylvania criminal statute intended to punish retaliation against witnesses (18 Pa.C.S. § 4953), and constituted intentional infliction of emotional distress.

### Summary Judgment Standard

Plaintiff has moved for summary judgment only as to liability against all defendants, while defendants have moved for summary judgment on all of plaintiff's claims. Under Rule 56(c) of the Federal Rules of Civil Procedure, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," then a motion for summary judgment must be granted. The proper inquiry on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v.*

*Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. On a motion for summary judgment, the facts should be reviewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

On cross-motions for summary judgment, the court must determine separately on each party's motion whether judgment may be entered in accordance with the summary judgment standard. *See Sobczak v. JC Penny Life Ins. Co.,* 1997 WL 83749, *1, No. 96–3924, 1997 U.S. Dist. LEXIS 1801, at *3 (E.D.Pa.) (citing 10A

---

lodged against Vassallo and records that reflected Vassallo was working out at a gym while on the clock as a police officer. (*Id.* at 60–61, 66.)

**5.** Prior to her testimony, Dooley had earned high marks on her performance evaluations. (Exh. 5 to Plaintiff's Motion for Partial Summary Judgment.)

Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 23–25 (2d ed. 1983)), *aff'd,* 129 F.3d 1256 (3d Cir.1997).

### First Amendment Analysis

Plaintiff's central claim is that the defendants retaliated against her for the exercise of her First Amendment right of expression. She seeks recourse under 42 U.S.C. § 1983, which authorizes suits against state and local government actors for constitutional violations.[6]

■ My inquiry into this claim begins with the well-established principle that public employees possess a constitutional right to express themselves on matters of public concern, free from the fear of retaliation. *See, e.g., Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("For at least 15 years, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutional protected interest in freedom of expression.") (citations omitted); *Pickering v. Board of Educ. of Township High School,* 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ("statements by public officials on matters of public concern must be accorded First Amendment protection") (citation omitted). That right, however, is not absolute, and must be balanced against the interest of the state in "promoting the efficiency of the public services it performs through its employees." *See Connick,* 461

U.S. at 142, 103 S.Ct. 1684 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731).

■ The balance between the First Amendment and the government's efficiency interest is discovered through a tripartite analysis. First, plaintiff must show that the activity or expression in question was protected.[7] Second, plaintiff must demonstrate that the protected activity was a substantial or motivating factor in the alleged retaliatory action.[8] Third, an employer may establish that it would have taken the adverse employment action regardless of whether the employee had engaged in the protected conduct.[9] *See Green v. Philadelphia Hous. Auth.,* 105 F.3d 882, 885 (3d Cir.), *cert. denied,* 522 U.S. 816, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997); *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996); *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir. 1995); *Swineford v. Snyder County,* 15 F.3d 1258, 1270 (3d Cir.1994); *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993).

### 1. Protected Interest

■ Whether the activity engaged in by an employee was protected by the First Amendment depends on the outcome of the balancing inquiry established by the Supreme Court in *Pickering v. Board of Education of Township High School.* First, the expression must be on a matter of public concern, and second, the public interest favoring the expression must out-

---

**6.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in a[ ] ... proper proceeding for redress.

**7.** *See Pickering,* 391 U.S. at 573, 88 S.Ct. 1731.

**8.** *See Mt. Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

**9.** *See Givhan v. Western Line Consol. Sch., Dist.,* 439 U.S. 410, 416, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

weigh the interest of the state in promoting the efficiency of its public services. *See Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality); *Green*, 105 F.3d at 885; *Pro*, 81 F.3d at 1288; *Watters*, 55 F.3d at 892. Thus, I must assess the interest of each party, and then determine which interest is more substantial.

■ The curious aspect of the protected interest analysis is that "[t]he inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684. Thus, while the inquiry involves consideration of facts and evidence, it "does not concern the sufficiency of the evidence presented to the jury." *See Cochran v. City of Los Angeles*, 222 F.3d 1195, 1200 (9th Cir.2000). Therefore, in order to assess whether the speech here warrants First Amendment protection, I must do that which is normally taboo on a motion summary judgment and engage in some weighing of the evidence presented by the parties.

### a. Public Concern

There is no dispute that the testimony of Dooley at the federal criminal trial of a former police officer accused of violating a suspect's civil rights was a matter of public concern. The Court of Appeals for the Third Circuit has held on two separate occasions that a public employee's appearance in court as a witness is a matter of public concern. *See Green*, 105 F.3d at 887; *Pro*, 81 F.3d at 1290 (quoting *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir.1989)).

### b. Weight of Dooley's Expressive Interest

How substantial was Dooley's interest in testifying at Vassallo's trial?

■ Where court appearances are concerned, the level of importance and public concern depends on largely on whether or not the testimony was given pursuant to a subpoena. *See Green*, 105 F.3d at 888 (citing *Pro*, 81 F.3d at 1291). This is the lesson of the decisions of the Court of Appeals for the Third Circuit in *Green* and *Pro*. *Pro* involved an employee of the clerk of the Orphans' Court of Philadelphia County who was subpoenaed by the wife of one of her supervisors to testify in a divorce proceeding. *See Pro*, 81 F.3d at 1285. The plaintiff appeared at the hearing but was never called to testify. *See id.* A few months after plaintiff's appearance, her position was eliminated, and the plaintiff sued for retaliation on First Amendment grounds. *See id.* In assessing whether plaintiff's court appearance was subject to First Amendment protection, the court of appeals gave great weight to the fact that the plaintiff appeared pursuant to a subpoena, quoting approvingly from the lower court's decision:

> "In the context of the workplace, a public employee can normally choose to speak or not to speak, on issues that may incur the wrath of his superiors. A subpoenaed witness has no choice but to appear at trial, unless he is willing to risk a finding of contempt. Nor does the subpoenaed witness normally have a say in whether he will be called to testify. Retaliation in these circumstances inflicts a punishment on a public employee for performing an act that he could not choose to avoid." ... We ... believe that the public employee's interest in responding to a subpoena and the judicial interest in having state employees respond to subpoenas without fear of employer reprisal justify our ruling.

*Pro*, 81 F.3d at 1290–91 (quoting *Pro v. Donatucci*, No 94–6001, 1995 WL 552980, at *5, 1995 U.S. Dist. LEXIS 13496, at *13–14 ( E.D.Pa. Sept. 18, 1995)).

One year after *Pro* was decided, the court of appeals again turned to the issue of court testimony and retaliation in *Green*, which involved a Philadelphia Housing Authority police officer's appearance as a character witness at the bail hearing of the son of an old friend. The appearance of the plaintiff in *Green* was voluntary; he was not subpoenaed. The court of appeals found this fact salient, observing that while a voluntary appearance in court as a witness was a matter of public concern, "it would seem that the public's interest in his court appearance is somewhat more limited than it would be if his appearance were subpoenaed." *Green*, 105 F.3d at 888. The court concluded that "the public interest favoring subpoenaed testimony is even stronger." *Id.*

I conclude that *Green* and *Pro* unmistakably command this Court to give substantial weight in the *Pickering* balance to testimony given pursuant to a subpoena.

■ While the parties dispute the nature of Dooley's appearance, there is no real dispute here; it is clear from the evidence that plaintiff was subpoenaed to testify. Defendant John F. Timoney, commissioner of the Philadelphia Police Department, testified at his deposition that he understood that a subpoena was issued for Dooley's testimony, and agreed that she was "technically subpoenaed." (Exh. 2 to Plaintiff's Motion for Partial Summary Judgment, Deposition Testimony of John F. Timoney, Sept. 1, 2000, at 97–98) ("Timoney Deposition"). Defendant John

Norris, deputy commissioner of the Philadelphia Police Department, also testified that plaintiff had been subpoenaed. (Exh. C to Defendants' Motion for Summary Judgment, Deposition Testimony of John Norris, July 25, 2000, at 91) ("Norris Deposition"). The report of the Internal Affairs investigation into Dooley's testimony at Vassallo's trial also reflects that she testified under subpoena. (Exh. O to Defendants' Motion for Summary Judgment, Memorandum on Internal Investigation, IAD # 98–1179, at 5.) Plaintiff received an official "court notice" requesting her presence as a witness at Vassallo's trial, which, as explained by defendants Norris and Small at their depositions, usually means that a subpoena was issued. (Exh. 7 to Plaintiff's Motion for Partial Summary Judgment, Court Notice, dated Feb. 20, 1998; Norris Deposition, at 91; Exh. U to Defendants' Motion for Summary Judgment, Deposition of Robert Small, Oct. 6, 2000, at 49.) Plaintiff also testified at a deposition that she was subpoenaed to testify at the Vassallo trial, but was notified of the subpoena through a court notice. (Exh. B. to Defendants' Motion for Summary Judgment, Deposition of Jeanette Dooley in *Vassallo v. Timoney*, Civil Action No. 00–84, Aug. 22, 2000, at 42–43.) The evidence overwhelmingly indicates, and I find, that there is no factual dispute that Dooley was indeed subpoenaed to testify at Vassallo's criminal trial, and that her testimony is therefore entitled to substantial protection under the First Amendment.[10]

---

10. I find it only distracting and not persuasive that the defendants have pressed their argument that plaintiff was not subpoenaed. The evidence, including the testimony of two defendants, leaves little doubt as to this question. Defendants, however, seek to confuse the issue with word games, arguing that Dooley "did not *receive* a subpoena" and appeared pursuant only to a "court notice." Plaintiff testified at a deposition that she was

subpoenaed and received notice of the subpoena through the police department. (Exh. B to Defendants' Motion for Summary Judgment, Deposition of Jeanette L. Dooley in the case of *Vassallo v. Timoney*, No. 00–84, Aug. 22, 2000, at 42–43.) The evidence from defendants themselves shows that the court notice was generated precisely because a subpoena issued; Norris and Small testified that as a matter of department policy, subpoenas

Defendants point to a number of factors that they claim erode the value of plaintiff's expressive interest. They first suggest that because Dooley was subjectively willing to testify for Vassallo at his trial, and because she had voluntarily done so on prior occasions, her subpoena was a mere formality, and this Court should pretend as if no subpoena was issued. Defendants produce no evidence to suggest that Dooley volunteered to testify at Vassallo's trial, and even assuming Dooley was willing to testify, I do not believe that Dooley's subjective willingness to testify decreased her expressive interest in testifying. It simply does not matter whether Dooley was willing to testify at Vassallo's trial, because the subpoena made her willingness irrelevant. Whether she wanted to testify or not, she had no choice but to testify or risk court sanctions. It is this aspect of a subpoena—that it leaves an individual with no real choice—that the court of appeals found decisive in both

*Green* and *Pro.* *See Green,* 105 F.3d at 888 (citing *Pro,* 81 F.3d at 1290).[11]

Second, defendants suggest that Dooley's alleged failure to inform the Office of the United States Attorney of the substance of her testimony diminished the importance of her expressive interest. I find a failure on her part to volunteer information to the U.S. Attorney regarding the substance of her testimony, particularly when there is no evidence that the U.S. Attorney asked for such information, is irrelevant to the limited question of the importance of her interest in testifying.[12]

■ Third, defendants argue that Dooley's testimony about McGrath and O'Leary losing prisoners was inaccurate and untrue, and thus her testimony is not entitled to much First Amendment protection. Of course, the inaccuracy issue is a red herring if Dooley's testimony was accurate and reliable, and there is compelling evidence that it was.[13] Dooley's testi-

---

are not issued directly to police officers, and that court notices are generated as a result of subpoenas. (Norris Deposition, at 91, Small Deposition, at 49.) Defendants describe a court notice as an "internal Police Department document notifying an officer that a request has been made for his/her appearance in Court," and claim that there is no indication of whether the notice was issued due to an informal request or from a subpoena. (Defendants' Memorandum in Support of the Motion for Summary Judgment, at 8 n. 8.) However, the deposition testimony of Timoney and Norris clearly demonstrates that they had no indication that the notice was issued due to an informal request, and that plaintiff was in fact subpoenaed. (Timoney Deposition, at 97–98).

Defendants' back-up arguments were articulated by Timoney at his deposition: (1) Dooley should have resisted the subpoena or at least inquired into its origins; and (2) Dooley colluded with Vassallo's lawyers to arrange for a subpoena to be issued. (Timoney Deposition, at 98–101.) The former observation is fanciful; fighting a federal subpoena is a not a gauntlet police officers should be expected to run. *See Pro,* 81 F.3d at 1290. The latter

allegation has no support in the record. Moreover, I do not find either argument relevant to the fundamental question of whether or not Dooley was subpoenaed.

11. Moreover, the Court of Appeals for the Third Circuit held in *Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988), that the motivation of a public employee in engaging in particular speech is not a determining factor in assessing the level of protection to which the speech is entitled. *See id.* at 1201 (citing *Connick,* 461 U.S. at 147, 103 S.Ct. 1684).

12. Moreover, Dooley testified at her deposition that she did not remember having talked about McGrath and O'Leary with Vassallo's defense counsel prior to her testimony, and thus would have had no indication that the loss of prisoners would come up during her trial testimony. (Exh A. to Defendants' Motion for Summary Judgment, Deposition of Jeanette L. Dooley, Aug. 22, 2000, at 272.) ("Dooley Deposition").

13. Assuming *arguendo* that plaintiff's testimony was inaccurate, the question posed by defendants is not whether perjured testimony is

mony was corroborated at Vassallo's trial by another police officer who testified under questioning by Vassallo's counsel that McGrath and O'Leary had lost prisoners. (Exh. 34 to Plaintiff's Motion for Summary Judgment, Addendum to IAD # 98–1179, Sept. 3, 1999, at 2–3.) [14] Plaintiff also presents an impressive array of depositions in which nine police officers testified about their independent recollections of McGrath and O'Leary losing prisoners under circumstances essentially identical to those described in Dooley's testimony. (Exh. 23 to Plaintiff's Motion for Partial Summary Judgment, Deposition of Todd Johnson, Oct. 24, 2000, at 9–11; Exh. 24, Deposition of Lisa Bennett, Oct. 24, 2000, at 12–14; Exh. 25, Deposition of Richard Young, Oct. 24, 2000, at 9; Exh. 26, Deposition of Thomas Peters, Oct. 24, 2000, at 8–11; Exh. 27, Deposition of Andrew McDonald, Oct. 24, 2000, at 9–11; Exh. 28, Deposition of Lamont Fox, Oct. 24, 2000, at 7–11; Exh. 29, Deposition of Thomas LaCorte, Oct. 24, 2000, at 8–12; Exh. 30, Deposition of Michael Harvey, Nov. 22, 2000, at 9–11; Exh. 31, Deposition of Mi-

entitled to *First Amendment* protection, but whether testimony that a witness believes is true but turns out to be inaccurate is protected. The Supreme Court in *Pickering* considered a teacher's expression that contained factual inaccuracies, and found that those inaccuracies did not undermine the First Amendment value of that speech. *See Pickering*, 391 U.S. at 572, 88 S.Ct. 1731. The Court of Appeals for the Third Circuit noted in *Swineford v. Snyder Cty.*, 15 F.3d 1258 (3d Cir.1994), that falsity is a factor in considering the protected status of speech, and that knowingly or recklessly made statements may not be subject to a high level of protection.

Thus, if Dooley had intentionally lied or was reckless with the truth on the witness stand, it is likely that her First Amendment interest would be less significant. But that did not happen here. Defendants are careful not to contend that Dooley knowingly perjured herself; at most they assert that her testimony concerning O'Leary's and McGrath's penchant for losing prisoners was inaccurate and that she failed to properly investigate the allegation before making it in open court. (Timoney Deposition, at 109; Norris Deposition, at 127.) Defendants do not claim, nor do they have evidence, that plaintiff's testimony was knowingly false, nor have they demonstrated that her testimony was reckless. She testified, in answer to specific questions, about her awareness of certain events. She acknowledged that she was not present for the events about which she testified, and testified only as to her limited knowledge.

Defendants make much of Dooley's failure to produce documentation to support her testimony, and they point to Internal Affairs and FBI investigations that turned up no documentation of such escapes, located no record of any disciplinary action arising out of such escapes, and heard from one officer that the officers who had lost the prisoner were not McGrath and O'Leary, but two other officers. (Exh. O to Defendants' Motion for Summary Judgment, Memorandum on Internal Investigation, IAD # 98–1179, at 4). That evidentiary void, however, was filled by a follow-up Internal Affairs investigation that located another police officer who was aware of the loss of prisoners by McGrath and O'Leary and *testified about it at the Vassallo trial.* (Exh. 34 to Plaintiff's Motion for Summary Judgment, Addendum to IAD # 98–1179, Sept. 3, 1999, at 2–3.) Furthermore, I cannot conclude that the absence of documentary evidence supporting plaintiff's testimony, or one other individual's contradiction of the testimony is sufficient to meet defendants' burden of demonstrating recklessness. *See Moore v. City of Wynnewood*, 57 F.3d 924, 933–34 (10th Cir.1995) (concluding that defendants had failed to show that plaintiff knew statements were false or spoke with reckless disregard for their truth or falsity). Thus, I cannot conclude that a mere inaccuracy in Dooley's testimony if present would substantially affect the calculus of her expressive interest.

14. Both Internal Affairs and the FBI overlooked the other officer's testimony during their initial investigations; it was discovered by internal affairs more than a year after the trial, necessitating an addendum to the original Internal Affairs memorandum. (Exh. 34 to Plaintiff's Motion for Summary Judgment, Addendum to IAD # 98–1179, Sept. 3, 1999, at 2–3.)

chael Kopecki, Oct. 24, 2000, at 8–9).[15] Furthermore, an arrest record involving McGrath and O'Leary reflects that a suspect pushed McGrath to the ground and fled; this, too, is consistent with Dooley's testimony. (Exh. 33 to Plaintiff's Motion

for Partial Summary Judgment, Investigation Report, Doc. No. 14–30879.) Even if accuracy could affect the expressive interest of a public employee, the evidence leaves little question about the reliability of Dooley's testimony.[16]

15. Defendants suggest that the testimony of these officers is inadmissible hearsay because none of the officers deposed by plaintiff witnessed the escape of any prisoners from O'Leary and McGrath. That suggestion is wrong for a number of reasons. First, the issue of whether an interest is protected under the First Amendment "does not concern the sufficiency of the evidence presented to the jury," *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1200 (9th Cir.2000); it is an issue of law for the Court to decide. Thus, even if the evidence that other officers knew of the escape of prisoners will never be heard at trial, and the Court may consider it as relevant and reliable evidence because here, the factual issues inform an overarching question of law. *See Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684. Second, under defendants' argument that the testimony is inadmissible hearsay because none of the officers witnessed any prisoner escapes, Dooley's trial testimony itself might have been inadmissible hearsay because, as she acknowledged, she was not testifying about having witnessed prisoner escapes, but she was allowed to testify only about her *awareness* of the fact that prisoners had escaped from McGrath and O'Leary. (Dooley Trial Testimony, at 37–38.) If the district judge in Vassallo's trial allowed Dooley to testify as to her awareness of the escapes, it seems to me for the limited purpose of determining the weight of plaintiff's expressive interest, their testimony should be held to the same standard at this stage of the case. Most of the officers who were deposed had more reliable, direct knowledge of the escapes than Dooley; some heard it over the radio and one joined in the search for an escaped suspect. (Exh. 31 to Plaintiff's Motion for Partial Summary Judgment, Deposition of Michael Kopecki, Oct. 24, 2000, at 8–9.)

Defendants also suggest that the deposition testimony of the police officers who recalled McGrath and O'Leary losing prisoners is irrelevant because the Court may not now consider evidence that was not before the department at the time it made its decision to

discipline Dooley. This argument misstates the record and misses the point. First of all, the addendum to the Internal Affairs memorandum submitted 18 months after Dooley's testimony, but more than nine months before the discipline was meted out to Dooley, acknowledged that the FBI and Internal Affairs had overlooked the fact that another police officer, Lisa Bennett, had testified at Vassallo's trial that she recalled O'Leary and McGrath losing a prisoner. (Exh. 34 to Plaintiff's Motion for Summary Judgment, Addendum to IAD # 98–1179, Sept. 3, 1999, at 2–3.)

As defendants correctly note, my job is to "look to the facts as the employer reasonably found them to be." *Waters*, 511 U.S. at 667–68, 114 S.Ct. 1878. Thus, I may factor in whether the department was "reasonable" in finding its facts. There was substantial evidence that Dooley's testimony was accurate at the time the decision to discipline Dooley was made. Such evidence undoubtedly was at the fingertips of the department, and I conclude that the department's failure to discover such evidence was unreasonable. I also conclude that the facts as found and interpreted by the department were not reasonable. Thus, I find the evidence of the other officers' knowledge of prisoner escapes on the watch of McGrath and O'Leary is reliable and highly relevant to a determination of the accuracy of plaintiff's testimony, and that I may properly consider it in coming to a legal conclusion concerning the protected status of plaintiff's testimony.

16. The context of Dooley's testimony further demonstrates that the issue of whether or not O'Leary and McGrath actually lost prisoners was of little import to the Vassallo trial. A review of Dooley's testimony demonstrates that Dooley was called primarily to establish bias against Vassallo on the part of O'Leary and McGrath; Vassallo's attorney was clearly attempting to elicit the fact that Vassallo was the one who reported the escape of the prisoners to Dooley, and thereby establish that O'Leary and McGrath held a grudge against

I conclude that plaintiff's expressive interest in her testimony at Vassallo's trial is undiminished by the concerns raised by the defendants. Therefore, her interest will be accorded substantial weight at the balancing stage.

### c. The Government's Interest

 In order to properly perform the balancing analysis called for by the Supreme Court in *Pickering*, I must also assess the nature of the government interest at stake. The seminal First Amendment retaliation cases have articulated it as "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ. of Township High School*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see also Waters v. Churchill*, 511 U.S. 661, 675, 681, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality) (speaking of the "potential disruptiveness," of certain kinds of speech to "the government's interest in efficient employment decisionmaking"). In assessing the employer's interest,

> courts [must] look to the facts as the employer reasonably found them to be. It may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence

when strong evidence is clearly available . . .

*Waters*, 511 U.S. at 677, 114 S.Ct. 1878. The government must offer more than speculative allegations to demonstrate disruption. *See Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir.1989).

 Putting aside for the moment the issue of potential disruption, the evidence of actual disruption is not nearly as voluminous as the defendants suggest. As discussed above, the evidence on the record indicates quite clearly that plaintiff's testimony, was neither "unsubstantiated" nor "inaccurate." It was, apparently, well known among the officers of the 14th District that McGrath and O'Leary had lost prisoners during arrests. Dooley, then, merely testified that she was aware of incidents of which a substantial number of other officers also were aware. Defendants' later discovery of evidence supporting Dooley's testimony, and Dooley's success in locating a police report and nine police officers to support her testimony suggests that defendants were less than copious in their investigation of the accuracy of her testimony. My charge is to look to the facts as the defendants "*reasonably found them,*" *Waters*, 511 U.S. at 677, 114 S.Ct. 1878 (emphasis in original), and in light of the substantial evidence that Dooley's testimony was accurate, I cannot conclude that the department "*reasonably found*" her testimony inaccurate. Rather,

---

Vassallo. (Dooley Trial Testimony, at 36–38.) Counsel for Vassallo succeeded only partially, because of the hearsay objections of the prosecutor. Thus, Dooley's testimony that McGrath and O'Leary lost prisoners was largely insignificant in the context of the trial.

Furthermore, Dooley carefully tailored her testimony and did not volunteer information that was not elicited by questioning. Dooley was asked whether she was aware of escapes by prisoners in the custody of McGrath and O'Leary, and answered in the affirmative. (Dooley Trial Testimony, at 36–37.) Acknowl-

edging that she was not present, she testified that she "became aware" of the escapes through Vassallo. (*Id.* at 37.) She also testified that one of the alleged escapes was the result of equipment failures, thus partially minimizing the responsibility of McGrath and O'Leary for the escape. (*Id.* at 37–38). She acknowledged on cross-examination that she had no paperwork on the incident, though she recalled generating some. (*Id.* at 54–55.) Thus, Dooley did not unnecessarily embellish on her testimony in a way that might have undermined her expressive interest.

it appears that the defendants "act[ed] based on extremely weak evidence when strong evidence [was] clearly available," *id.*, and here, the strong evidence pointed in the other direction.

The other factors that defendants believe demonstrate actual disruption suffer similar weaknesses. First, because Dooley's testimony concerning McGrath's and O'Leary's loss of prisoners was not only apparently accurate, but was already known by a number of officers in the 14th District, I find it difficult to see how her recounting of their loss of prisoners, in and of itself, disrupted the department.[17]

Second, I find the alleged injury Dooley's testimony inflicted to the Philadelphia Police Department's relationship with the FBI, the Office of the United States Attorney, and the District Attorney's office to be insubstantial. The disruption of the relationship with the FBI and the U.S. Attorney was, according to an FBI memorandum, based on the "inaccuracy" of Dooley's testimony and her attempt to discredit McGrath and O'Leary. (Exh. J to Defendant's Motion for Summary Judgment, FBI Memorandum on Vassallo Investigation, May 5, 1998, at 10–11.) However, as discussed above, there is substantial evidence that Dooley's testimony was accurate, and thus the FBI's and

U.S. Attorney's frustration with the inaccuracy of Dooley's testimony was not well founded and thus misplaced.

Likewise, the evidence of actual disruption of the relationship between the Philadelphia Police Department and the District Attorney's Office is negligible; the federal trial was, of course, prosecuted by the Office of the United States Attorney, and not the District Attorney's office.[18] Accordingly, I find that any actual injury to the Philadelphia Police Department's relationship to the FBI and the District Attorney's Office caused by Dooley's testimony was not substantial.

■ Defendants correctly note that they need not show actual disruption and can prevail through a showing of "potential disruptiveness." *Waters,* 511 U.S. at 680, 114 S.Ct. 1878. The question, then, is what is the potential for disruption when a high-ranking police officer testifies reliably at the federal criminal trial of one former police officer in a manner that reflects poorly on the competency of two other active police officers who testified for the prosecution? A number of courts have commented on the elevated importance of avoiding disruption in law enforcement agencies. *See, e.g., O'Donnell v. Barry,* 148 F.3d 1126, 1135 (D.C.Cir.1998) ("because of the special degree of trust and

17. Certainly, the loss of the prisoners must have been embarrassing to McGrath and O'Leary, but in light of the fact that the escapes were common knowledge, it is unlikely that plaintiff's testimony subjected them to any more embarrassment within the department than the incidents themselves, at least one of which was broadcast over the police radio and required the assistance of additional officers. (Exh. 24 to Plaintiff's Motion for Partial Summary Judgment, Deposition of Todd Johnson, Oct. 24, 2000, at 10; Exh. 24, Deposition of Lisa Bennett, Oct. 24, 2000, at 13; Exh. 26, Deposition of Thomas Peters, Oct. 24, 2000, at 9–10.)

18. Defendants produce a letter written by an assistant district attorney to then-Philadelphia Police Commissioner Richard Neal, in which the district attorney addresses a complaint concerning Dooley's testimony on Vassallo's behalf. The problem with the letter is that it has nothing to do with the testimony of Dooley at Vassallo's federal criminal trial, which is the speech at issue in this case. Rather, the letter concerns Dooley's appearance at Vassallo's retail theft trial, in which she never in fact testified. Thus, there is no evidence that Dooley's testimony at Vassallo's federal trial injured the Philadelphia Police Department's relationship with the District Attorney's Office.

discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees"); *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994) (citations omitted) (holding that a police or fire department need has a unique "need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers."). Thus, the potential for Dooley's testimony to disrupt the Philadelphia Police Department must be taken seriously.

Defendants contend that the decision of the Court of Appeals for the Third Circuit in *Green* demands that this Court defer to the interest of a law enforcement agency in preventing potential disruption. *Green*, however, is quite different from this case.[19] There, the court of appeals observed,

> [A] public employee in a sensitive position like Green cannot turn a blind eye to the possible consequences of his *voluntary* testimony. The responsibility must lie with Green to investigate the nature of the criminal charges, and to bear any risks associated with his *voluntary* court appearance.

*Green*, 105 F.3d at 889 (emphasis added). It is clear that in *Green*, the court of appeals found the voluntariness of the testimony to be the key potentially disruptive factor in the law enforcement setting. The court of appeals was troubled by the fact that Green freely chose to testify and lend his credibility (and that of his employer) to a criminal defendant when he could have avoided doing so. Thus, *Green* differs sharply from the instant case, in which Dooley did not choose to testify, but was subpoenaed, and thus the disruptive element of a police officer choosing to testify is absent here. Her demonstrated past willingness to testify on Vassallo's behalf cannot overcome the mandatory nature of the subpoena; regardless of whether she wanted to testify or not, she had no real choice in the matter, and thus the element of voluntariness was not present in any meaningful way.

■■■ Defendants contend that the potential disruptiveness here is even stronger than in *Green* because Dooley is a higher ranking officer, and therefore the disruptive effects the court of appeals noted in *Green* are magnified here. However, rank alone, while relevant, is not dispositive, particularly when the expressive interest of the employee is significant. *See Piesco v. City of New York*, 933 F.2d 1149, 1157 (2d Cir.) (holding that fact that plaintiff held a senior position and gave

19. In *Green*, the court of appeals addressed the Philadelphia Housing Authority Police Department's concern that the "voluntary appearance, as a narcotics officer, at a bail hearing on behalf of a reputed organized crime associate would bring discredit upon the [department], endanger the plaintiff and tarnish the image of the [department] in the eyes of the residents of public housing the department serves...." *Green*, 105 F.3d at 888. The court of appeals found that "[t]hese interests merit substantial protection, and any risk of departmental injury or disruption weighs heavily under the *Pickering* balancing test." *Id.* Reviewing the record, the court of appeals found reliable evidence that a police officer reported Green's appearance at the hearing, that other police officers avoided him after his appearance because they feared he had mob connections, and that "any perceived breach of trust and security could reasonably constitute a threat to the [department], its officers, and its relationships with other police drug units and the community it serves." *Id.* at 889. The court of appeals concluded "there was a risk of departmental injury based on the 'potential disruptiveness'" of Green's voluntary testimony, and that the police department's interest in preventing such an injury outweighed the value of the plaintiff's speech. *Green*, 105 F.3d at 889.

remarks during legislative hearing that were unfavorable to her organization did not outweigh plaintiff's First Amendment interest in testifying, even without a subpoena), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). Even if it were true that all things being equal, a high-ranking officer's testimony can be more disruptive than that of a lower ranking officer,[20] all things are not equal here; Dooley was subpoenaed and the plaintiff in *Green* was not, and I find that the subpoena alters the landscape of this case, because voluntary testimony is far more disruptive than mandatory, subpoenaed testimony under the reasoning of *Green.* Therefore, I conclude that the potential for disruption in this case is less than it was in *Green.*

Defendants cite a number of potential injuries to the effectiveness and efficiency of the Philadelphia Police Department that they claim could have arisen from Dooley's testimony. They suggest that the public image of the Philadelphia Police Department could have suffered as a result of Dooley's testimony concerning the escapes of prisoners from McGrath and O'Leary; both because it made two police officers appear incompetent and because it publicly pitted police officers against one another. Defendants also argue that Dooley's negative testimony concerning McGrath and O'Leary, two police officers who came forward to testify against a fellow officer, could have had the ancillary effect of deterring other police officers from coming forward with information concerning mis-

conduct by fellow officers. Defendants contend that her willingness to present evidence on behalf of a criminal defendant generally is at odds with the mission of the police department to catch and gather evidence against criminals. And defendants claim that Dooley's effectiveness as a leader in the department could have been undermined by her testimony.

I find the potential disruptiveness of Dooley's testimony to the efficiency and operation of the Philadelphia Police Department is not substantial, considering the context in which the testimony was given. A trial of a former police officer for misconduct in the line of duty is bound to be disruptive, and a police department certainly will be affected when it is put in the position of investigating and prosecuting one of its own. Such circumstances inevitably polarize police officers into opposing sides in an uncomfortably public and emotionally charged manner, and damages the trust and *esprit de corps* that is so essential to any law enforcement agency. Testimony like Dooley's, then, comes with the territory of a trial like Vassallo's.[21] Considering the highly charged context of such a trial, Dooley's testimony was rather tame; it was subpoenaed, reliable, and elicited through questioning. Her observations concerning McGrath and O'Leary were factual and already known within the police department, and were not harshly critical. Likewise, I believe any potential additional injury to the public image of the department because of Dooley's testimony would be negligible. And the potential of

---

**20.** It is not necessarily true that a high-ranking officer's testimony has more disruptive potential than that of a lower-ranking officer. For instance, when a lower-ranking officer speaks out against the leadership of a police department, the effects are far more widespread than in the converse situation, because the former affects the entire department, whereas the latter affects only certain officers.

**21.** As noted earlier, another officer testified about McGrath's and O'Leary's loss of prisoners at Vassallo's trial. (Exh. 42 to Plaintiff's Motion for Partial Summary Judgment, Addendum to IAD # 98–1179, Sept. 3, 1999, at 2.)

Dooley's testimony for deterring officers from reporting police misconduct is insubstantial in comparison to the deterrent effect of a failure to secure a conviction in the case of Vassallo. Thus, the potential disruptiveness of Dooley's testimony underwhelms me. *See Miles v. City of Philadelphia*, No. 98–5837, 2001 WL 392878, 2001 U.S. Dist. LEXIS 4736, at *22 (E.D.Pa. April 10, 2001) ("Discontent over the subject matter to which the protected speech relates, however, does not render that speech itself disruptive.").[22]

Having reviewed the evidence of actual and potential disruption in this case, I find that the police department's interest in preventing and remedying any such disruption arising out of plaintiff's testimony was moderate at best.

### d. Balancing the Interests

█ It may well be that when a high ranking police officer testifies voluntarily, absent a subpoena, in a way that untruthfully and inaccurately reflects poorly on other officers, there is a serious risk that the efficiency of the police department will be disrupted. And it may be that in such a case, the potential for such departmental disruption would outweigh the First Amendment value of the officer's testimony. This, however, is not such a case. A subpoena was issued for Jeanette Dooley's testimony, and therefore her testimony was not voluntary. She complied with that subpoena and testified. There is no allegation that she gave perjured testimony, and there is substantial evidence that her testimony was reliable. Thus, I am faced with the question of whether a high ranking officer's reliable, subpoenaed testimony, which is critical of two patrol officers, is entitled to sufficient First Amendment protection to trump a police department's interest in preventing and remedying the potential disruption of the testimony.

The Supreme Court has held that "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression," *Connick*, 461 U.S. at 150, 103 S.Ct. 1684, and noted that "[i]n many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished," *Waters*, 511 U.S. at 674, 114 S.Ct. 1878. I believe this is just such a situation.

On one side of the scale is Dooley's interest in testifying; an interest that I have concluded is entitled to great weight. On the other side of the scale is the interest in avoiding potential disruption and

---

**22.** Dooley's testimony also had less disruptive potential because it related to officers she no longer supervised. The Court of Appeals for the Third Circuit has recognized that

> in calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important. Specifically, we must look to 'the proximity within an organization hierarchy as a significant factor in the employer's demonstration that a public employee's speech had a detrimental working impact on a working relationship.'

*See Baldassare v. New Jersey*, 250 F.3d 188, 197 (3d Cir.2001) (quoting *Swineford v. Snyder Cty.*, 15 F.3d 1258, 1272–73 (3d Cir. 1994)). There is little proximity here between Dooley and the officers whose conduct she discussed in her testimony; she no longer supervised those officers and no longer worked in the same district as them at the time of her testimony. Her testimony was not directed at her then-supervisors or co-workers, and any potential impact on her relationships with them arising out of her testimony would have been diminished to insubstantial. *See Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir.1989) (government's justifications for regulating speech were weaker when officer's critical statements did not related to someone with whom officer had to work closely). Thus, the potential for the Dooley's testimony to disrupt working relationships was negligible.

promoting efficiency in the Philadelphia Police Department, which I have concluded is moderate. The scales tip decisively in plaintiff's favor.

Defendants simply have not made a showing sufficient to overcome plaintiff's substantial interest in testifying reliably pursuant to a subpoena.[23] Having concluded, then, that under the circumstances of this case, plaintiff's First Amendment interest in giving testimony was substantial, and that the Philadelphia Police Department's interest in promoting efficiency and preventing potential disruption was moderate at best, I now hold that the *Pickering* balance favors the expressive interest of Dooley over the efficiency interests of the Philadelphia Police Department.[24] Accordingly, I conclude as a matter of law that Dooley had a protected First Amendment interest in testifying at the trial of Michael Vassallo.

## 2. Substantial or Motivating Factor

■ Having concluded that Dooley possessed a protected interest in her testimony, I now turn to the second step of the First Amendment retaliation analysis, in which I must determine whether there is a genuine issue of material fact as to whether the protected expression was a substantial or motivating factor in the department's decision to take an adverse employment action against her. *See Mt. Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The first step here is to identify the adverse employment actions at issue. The most obvious adverse employment action is plaintiff's suspension; she was suspended for a total of 15 days for conduct arising out of the Vassallo investigation and trial.[25] Plaintiff also alleges that she was transferred to the Night Division because of her testimony; there is ample evidence to suggest to a reasonable jury that such a transfer is an adverse employment action. (Dooley Deposition, at 134–35; Timoney Deposition, at 13–16, 18; Exh. 15 to Plaintiff's Motion for Partial Summary Judgment, Deposition of Anthony Wong, Chief Inspector of the Philadelphia Police Department, Sept. 20, 2000, at 16–19.) Plaintiff suggests that her later request for a transfer out of the Night Division also was denied because of her testimony. And finally, it appears that plaintiff believes that an official reprimand she received

---

**23.** Even if there were a more compelling showing of potential disruption in this case, I would still have to balance a police department's interest in preventing disruption against the right of a police officer to testify truthfully pursuant to a subpoena. The First Amendment demands that absent a very strong demonstration of disruption, the officer's right to testify truthfully prevails. The alternative is to allow police departments to discipline officers for complying with a subpoena and answering questions truthfully under oath. In that scenario, the officer is damned if she does and damned if she doesn't; ignoring the subpoena, testifying untruthfully, or refusing to answer questions exposes her to court sanctions, while complying with her legal duty exposes her to department discipline. *See Pro,* 81 F.3d at 1290.

**24.** The decisions of courts of appeals from other circuits in the law enforcement context cited by defendants do not persuade me otherwise, because each of them involved voluntary speech, not the kind of compelled speech involved here. *See Cochran v. City of Los Angeles,* 222 F.3d 1195 (9th Cir.2000) (voluntary complaints by police officers about superiors); *Kokkinis v. Ivkovich,* 185 F.3d 840 (7th Cir.1999) (television interview given by police officer); *Tedder v. Norman,* 167 F.3d 1213 (8th Cir.1999) (voluntary deposition testimony by police academy official); *Lytle v. City of Haysville,* 138 F.3d 857 (10th Cir.1998) (public statements by police officer).

**25.** While it is unclear whether Dooley is challenging her entire 15–day suspension, I will assume she is challenging all 15 days.

from Timoney on June 1, 2000, was designed to retaliate against her for her testimony at Vassallo's trial.[26]

Defendants do not dispute that plaintiff's testimony was a substantial or motivating factor in five of the fifteen days of suspension she received, nor could they. The documentation related to the Internal Affairs investigation of Dooley that led to her suspension explicitly states that her testimony about McGrath and O'Leary was the reason for her five-day suspension. (Exh. 17 to Plaintiff's Motion for Partial Summary Judgment, Memorandum on Internal Investigation, IAD # 98–1179, October 19, 1998; Exh. 21, Notice of Suspension of Jeanette Dooley.) Under the heading of Allegation # 3, the Internal Affairs memorandum outlines her testimony at Vassallo's trial concerning the prisoner losses of McGrath and O'Leary, and sustains the allegation that Dooley engaged in misconduct in testifying about McGrath and O'Leary. (Exh. 17 to Plaintiff's Motion for Partial Summary Judg-

ment, Memorandum on Internal Investigation, IAD # 98–1179, October 19, 1998, at 3–5, 13).[27] The department's notice of Dooley's suspension, which was signed by defendant Timoney, reads, in pertinent part,

CONDUCT UNBECOMING AN OFFICER, Section: Unspecified

In that, during testimony on or about 2/20/98, you testified that P/O's O'Leary and McGrath lost prisoners. Also, you testified stating, "Yea, [sic] the suspect punched Officer McGrath and took off and was caught down the block." This was untrue. The FBI report indicated that there was no evidence presented or found that shows that O'Leary and McGrath were responsible for having a prisoner escape from their custody. In fact, the officers involved were P/O Keen and P/O Fedorick. You, by offering false and/or unsubstantiated information, defamed both P/O Leary and McGrath. This was done to discredit

**26.** Plaintiff also includes in her complaint a litany of other alleged adverse employment actions, including refusals to discipline "insolent" conduct by an internal affairs officer, a refusal to allow her take a polygraph test to clear her of certain allegations, an admonishment her for court appearances, derogatory comments and false rumors being spread about plaintiff, sustained "trumped up" charges, chastisements, public humiliations, a refusal to process plaintiff's complaint to the Equal Employment Opportunity Commission, removal of responsibilities from plaintiff, and repeated instances of tailing and following by other officers. (Complaint, at ¶¶ 28–33, 37, 41(i)–(iii), (v)–(viii), 45) I do not address those allegations here because they lack evidentiary support in this record or have not been pressed on the motions for summary judgment. Moreover, it is unclear under many of these allegations which, if any, of the defendants plaintiff believes caused them.

**27.** The Internal Affairs memorandum included the following commentary on Dooley's testimony:

It is perfectly permissible to have been subpoenaed, appear, and testify, as a factual witness before any court or judicial body or give testimony as a character witness, provided that the guidelines of PD # 13 are followed, providing factual information and/or opinion as to their character. It is not acceptable conduct, however, for a Philadelphia Police Captain, to give inflammatory, demeaning testimony of un-documented, un-investigated allegations of negligence and or misconduct, which they represent as fact, to attack the character of two active Police Officers before the court as Commonwealth witnesses, solely for the purposes of attempting to discredit them and their testimony, in aide of the defense, at a criminal proceeding.
(Exh. 17 to Plaintiff's Motion for Partial Summary Judgment, Memorandum on Internal Investigation, IAD # 98–1179, October 19, 1998, at 3–5, 13.)

them in their testimony, in aid of the defense at a criminal trial. This attacked the character of two active officers before the court and is conduct unbecoming an officer.

(Exh. 21 to Plaintiff's Motion for Partial Summary Judgment, Notice of Suspension of Jeanette Dooley.) She was suspended without pay for five days for "Conduct Unbecoming an Officer" as a result of that allegation. (*Id.*; Exh. 20, Memorandum on Penalty Recommendation for Jeanette Dooley, April 4, 2000.) I conclude that a reasonable jury would have no choice but to find from these documents that Dooley's protected testimony was a substantial or motivating factor in the department's decision to suspend her for those five days. Accordingly, summary judgment will be granted in plaintiff's favor on the issue of whether her testimony was a motivating factor in the decision to suspend her for five days, and defendants motion for summary judgment will be denied. There remains a genuine issue of material fact as to whether her testimony was a substantial or motivating factor in the other 10 days of her suspension, which were facially based on other alleged misconduct by Dooley, and therefore summary judgment will be denied to plaintiff on that issue.

■ I conclude that a reasonable jury might find that her testimony at Vassallo's trial was a substantial or motivating factor in her transfer to Night Command. Most persuasive is the testimony of defendant Zappile that he suggested another deputy commissioner transfer Dooley because of her testimony. (Exh. A to Plaintiff's Response to Defendant's Motion for Summary Judgment, Deposition of Richard A. Zappile, Oct. 4, 2000, at 21–22.) Also relevant is the fact that the transfer came a few months after Dooley's testimony at the Vassallo trial and a few weeks after a meeting between Dooley and defendant Ti-

money during which he confronted her about her conduct surrounding the Vassallo trial. (Timoney Deposition, at 36–39.) On the other hand, defendants have produced evidence that the department was being reorganized at the time of Dooley's transfer, and that she was having problems with her supervisor, suggesting the transfer would have taken place regardless of her testimony at Vassallo's trial. (Timoney Deposition, at 40–61, Exh. N to Defendants' Motion for Summary Judgment, Timoney's Answers to Interrogatories, at p. 4.) Therefore, the motions of both parties for summary judgment will be denied on the question of whether plaintiff's testimony was a substantial or motivating factor in her transfer to the Night Division.

■ I can find no evidence from which a reasonable jury could infer that the denial of her request to transfer out of the Night Division was substantially motivated by her testimony. The denial took place in December 1998, long after her testimony, and was accompanied by a memorandum that made no reference to her testimony. Plaintiff points to no evidence other than her own suspicion that the denial was part of a continuing effort to retaliate against her for her testimony at Vassallo's trial. (Dooley Deposition, at 470–75.) Therefore, defendants' motion for summary judgment will be granted on this point and plaintiff's motion will be denied.

On June 1, 2000, plaintiff received an official reprimand from defendant Timoney arising out of her testimony at Vassallo's bail hearing in October 1997. (Exh. 13 to Plaintiff's Motion for Partial Summary Judgment, Official Reprimand, June 1, 2000.) Defendants' given reason for the reprimand was that Dooley had appeared without a subpoena and failed to notify the commissioner as required under department regulations. (*Id.*) The formal inves-

tigation into the reprimand was initiated on February 24, 1998, two days after her testimony at Vassallo's federal trial, despite the fact that the bail hearing had taken place four months earlier. (Exh. 11 to Plaintiff's Motion for Partial Summary Judgment, Memorandum from Anthony Wong, Feb. 24, 1998.) I conclude that a reasonable jury could conclude from the temporal proximity of her testimony at Vassallo's trial and the bringing of the Vassallo-related charges, along with the fact that the charges had lain fallow for months, that Dooley's testimony at Vassallo's trial was a substantial or motivating factor in the decision to reprimand her.

### 3. Alternative Reasons for Adverse Actions[28]

■ Defendants may yet prevail by demonstrating that they would have taken the same steps against Dooley regardless of whether she would have testified. *See Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 416, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). As to Dooley's five-day suspension, the evidence cannot be disputed; the records of defendants demonstrate that Dooley was suspended for five days because of her testimony at the trial of Michael Vassallo. (Exh. 17 to Plaintiff's Motion for Partial Summary Judgment, Memorandum on Internal Investigation, IAD # 98–1179, October 19, 1998; Exh. 20, Memorandum on Penalty Recommendation for Jeanette Dooley, April 4, 2000; Exh. 21, Notice of Suspension of Jeanette Dooley.) Defendants cannot contend that they would have suspended Dooley for other reasons, because they

did in fact suspend Dooley for other reasons; she received an additional 10 days of suspensions for making false entries on departmental records, failing to properly supervise subordinates, and other misconduct. A reasonable jury would have no choice but to find that plaintiff was suspended for five days because she engaged in a protected activity and that absent her testimony, she would not have been suspended for those five days. Plaintiff's motion for summary judgment must therefore be granted as to the five-day suspension Dooley received for testifying at trial, and defendant's motion must be denied on that issue.

■ Because the other 10 days of suspension were related to Dooley's conduct with respect to Vassallo, a reasonable jury could find that there were no valid alternative reasons for the 10 days of suspension, and therefore, defendants' motion for summary judgment as to the 10 days of suspension will be denied. However, a reasonable jury also could find that she would have received the 10 days of suspension absent her testimony, and therefore, plaintiff's motion for partial summary judgment will be denied as well.

■ I also conclude that there remains a genuine issue of material fact as to whether plaintiff would have been transferred to the Night Division had she not testified at Vassallo's trial. Again, the testimony of defendant Zappile was that he directed Dooley's transfer because of her testimony, and a reasonable jury could conclude from that Zappile's testimony that absent Dooley's testimony at Vassal-

---

**28.** Defendants reference a number of comments Dooley made to the press during the Vassallo trial that were critical of the Internal Affairs Department and the FBI, suggesting that that conduct generally justified the discipline of Dooley. Such statements to the press by a high-ranking police officer could cause

disruption and be sanctionable. However, the documents concerning Dooley's five-day suspension for her testimony do not reference statements to the press, and defendants do not point to evidence that her press statements played a role in the employment actions taken against her.

lo's trial, she would not have been transferred. (Exh. A to Plaintiff's Response to Defendant's Motion for Summary Judgment, Deposition of Richard A. Zappile, Oct. 4, 2000, at 21–22.) Then again, there is evidence that the transfer was part of a department-wide reorganization and was intended to alleviate tension between Dooley and her supervisor. (Timoney Deposition, at 40–61.) Therefore, both parties' motions for summary judgment will be denied as to her transfer to the Night Division.

■ I cannot conclude that there is a genuine issue of material fact as to whether plaintiff would have been reprimanded on June 1, 2000, even if she had not testified at Vassallo's trial. The departmental directive that formed the basis of plaintiff's reprimand provides: "No witness shall give testimony as a character witness without being subpoenaed and previously notifying the Police Commissioner." (Exh. 11, Plaintiff's Motion for Partial Summary Judgment, Statement of Charges Filed, Feb. 24, 1998, citing Disciplinary Code, Art. V, Sec. 5.75.) Plaintiff testified at Vassallo's bail hearing as a character witness despite the fact that she was not subpoenaed, and thus facially violated the regulation. (Dooley Deposition, at 256–57.) The fact that the charges were instituted two days after her testimony at Vassallo's trial alone is not enough evidence for a reasonable jury to conclude that the department would not have made the same decision even in the absence of testimony. Therefore, defendants' motion for summary judgment will be granted as to the June 1, 2000, reprimand, and plaintiff's motion on that issue will be denied.

### 4. Conclusion

■ I have concluded as a matter of law that plaintiff's testimony was protected under the First Amendment. I also have concluded that plaintiff is entitled to summary judgment on her § 1983 claim that she was suspended for five days for engaging in that protected expression. There remain genuine issues of material fact as to 10 other days of suspension and plaintiff's transfer, and therefore, those issues will proceed toward trial. However, a reasonable jury could not find in plaintiff's favor on her claims concerning her June 1 reprimand and the denial of her request to transfer, and judgment will be granted in defendants' favor on those issues.[29]

### *Personal Participation Under § 1983*

Three of the individual defendants who are officials in the Philadelphia Police Department—Norris, Zappile, and Small—contend that they were not personally involved in any of the adverse employment actions alleged by Dooley, and therefore cannot be held liable under § 1983. Defendant Timoney does not contest his personal involvement.

■ Defendants are correct in arguing that § 1983 requires personal involvement in the challenged conduct. *See Robinson v. City of Pittsburgh*, 120 F.3d

---

29. Plaintiff, in her motion for summary judgment, raises for the first time an esoteric argument that testimony in a federal trial is protected by the Supremacy Clause of the Constitution, independent of the First Amendment, citing *Benedict v. Town of Newburgh*, 95 F.Supp.2d 136, 139 (S.D.N.Y.2000). The benefit to plaintiff of this argument is that no balancing test would be required under the Supremacy Clause. Plaintiff did not allege a violation of the "Supremacy Clause" in her complaint, and she cannot raise it now. Even if she could, it would be unnecessary to venture onto that thin ice, because I can locate no precedent for the proposition in this circuit (or in any other case outside of the one cited by plaintiff), for analyzing claims of retaliation for testimony in court under any constitutional provision but the First Amendment.

1286, 1294 (3d Cir.1997); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988).[30] Thus, the question is whether there is sufficient evidence that Norris, Small, and Zappile were personally involved in plaintiff's suspension or transfer.

Plaintiff's case against Norris does not appear to be strong. Plaintiff asserts that the Internal Affairs investigation that led to her suspension took place on Norris' watch, while he headed the Internal Affairs Department. In her brief, plaintiff points evidence, in the form of her testimony, that Norris refused to pursue leads that would have been favorable to her in the course of the Internal Affairs investigation, acquiesced in the passing of rumors about Dooley, refused to allow her to take a polygraph examination to clear her name, and subjected her to surveillance. However, none of this evidence relates to the adverse employment actions that are the subject of this litigation or provides enough for a reasonable jury to find that Norris participated in those actions. There are, however, a few shreds of evidence that suggest that Norris played a role in the investigation that led to Dooley's suspension including Norris' initials on the Internal Affairs memorandum (Exh. 17 to Plaintiff's Motion for Partial Summary Judgment, Complaint Routing Slip), and his deposition testimony that he reviewed the Internal Affairs memorandum before it became final and agreed with its conclusions (Norris Deposition, at 115, 141) and "I proved it [Dooley's testimony]

wrong" (*Id.* at 128). I conclude that while the evidence is not overwhelming, viewed in the light most favorable to the plaintiff it could convince a reasonable jury that Norris was personally involved in Dooley's suspension. There is, however, no evidence from which a reasonable jury could conclude that Norris was personally involved in the decision to transfer her.[31]

There is evidence that Zappile was involved in the decision to transfer Dooley. Zappile was a deputy commissioner in the Philadelphia Police Department at the relevant time, and he read about plaintiff's testimony in Vassallo's trial in the media. (Exh. A to Plaintiff's Response to Defendant's Motion for Summary Judgment, Deposition of Richard A. Zappile, Oct. 4, 2000, at 16.) He approached a fellow deputy commissioner and instructed him to transfer Dooley out of the 14th District during the Internal Affairs investigation. (*Id.* at 17, 22.) This is sufficient for a reasonable jury to find that Zappile was personally involved in Dooley's transfer. There is, however, no evidence that Zappile was involved in Dooley's suspension. Therefore, defendants' motion for summary judgment will be denied as to Zappile's involvement in the transfer decision. Because there is no evidence that Zappile was involved in Dooley's suspension, his motion for summary judgment will be granted on that issue. However, because there are genuine issues of material fact as to whether the transfer

---

**30.** The personal involvement element stems from two different aspects of § 1983 claims; the theory of liability and causation. *See generally Williams v. Pennsylvania State Police*, 144 F.Supp.2d 382, 383 (E.D.Pa.2001). First, an individual defendant may not be liable on a theory of *respondeat superior*. *See id.* Second, causation by an individual defendant in a § 1983 action may be established either with evidence of direct personal involvement in the alleged constitutional violation by the defendant, or with evidence that the defendant set in motion a series of acts by others that the defendant knew or reasonably should have known would cause others to inflict the constitutional injury. *See id.*

**31.** Norris testified at his deposition that he played no role in the transfer of Dooley, and that it took place outside his command. (Norris Deposition, at 49.)

was retaliatory in nature, plaintiff's motion for partial summary judgment as to Zappile also will be denied.

▇ While plaintiff contends that Timoney, Norris, and Zappile were personally involved in the actions taken against her, she does not respond to defendants' contention that there is insufficient evidence to proceed to trial against defendant Small. My review of the deposition of Small reveals that he and Dooley had a rocky relationship, but there is nothing in the deposition that indicates that Small was personally involved in an effort to transfer or suspend plaintiff because of her testimony at Vassallo's trial.[32] Therefore, summary judgment will be granted in favor of defendant Small.

### Qualified Immunity

▇ The individual defendants Timoney, Norris, Small, and Zappille contend that even if they committed a constitutional violation, they are entitled to qualified immunity. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Siegert v. Gilley,* the Supreme Court clarified the analysis in the qualified immunity setting, requiring that the district court first determine "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see also Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right). The district court must then proceed to assess whether the right was

"clearly established" at the time of the alleged violation, and whether the unconstitutional nature of the action would have been apparent to an objectively reasonable official. *See Showers v. Spangler,* 182 F.3d 165, 171–72 (3d Cir.1999).

▇ I have already concluded that there is a valid constitutional right at issue in this case. The very recent decision of the Court of Appeals for the Third Circuit in *Baldassare* leaves no question as to whether the constitutional right at issue here was clearly established:

> Defendants' argument that Baldassare's First Amendment rights were not clearly established cannot be sustained.... Some years ago, we recognized that "as of 1982 the law was 'clearly established' that a public employee could not be demoted in retaliation for exercising his rights under the first amendment."

*Baldassare v. New Jersey,* 250 F.3d 188, 201 (3d Cir.2001) (citing *Green v. Phila. Hous. Auth.,* 105 F.3d 882 (3d Cir.), *cert. denied,* 522 U.S. 816, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997); *Watters v. City of Philadelphia,* 55 F.3d 886 (3d Cir.1995); *Feldman v. Philadelphia Hous. Auth.,* 43 F.3d 823 (3d Cir.1995); *Holder v. City of Allentown,* 987 F.2d 188 (3d Cir.1993); *O'Donnell v. Yanchulis,* 875 F.2d 1059 (3d Cir. 1989); *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir.1983)). I conclude that the right asserted by Dooley was clearly established.

▇ Would a reasonable official have known that taking action against Dooley for that her testimony was unconstitutional? The "objectively reasonable" inquiry asks "whether a reasonable person could have believed the defendant's actions

---

**32.** Small testified that he recommended in a memorandum that Dooley be transferred, but that memorandum was written in September 1997, well before Dooley testified at Vassallo's

trial, and therefore could not have been in retaliation for her testimony. (Exh. U to Defendants' Motion for Summary Judgment, Deposition of Robert Small, Oct. 6, 2000, at 55.)

to be lawful in light of clearly established law and the information he possessed." *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. The Court of Appeals for the Third Circuit has stated that "a good faith belief in the legality of the conduct is not sufficient;" rather, the belief must be objectively reasonable. *Parkhurst v. Trapp,* 77 F.3d 707, 712 (3d Cir.1996). Normally, where the constitutional right at issue is found to be clearly established, "the immunity defense should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–819, 102 S.Ct. 2727.

■■ A defendant may defeat a finding that her conduct was not objectively reasonable in two ways. First, under "extraordinary circumstances," a defendant may argue that she "neither knew nor should have known of the relevant legal standard." *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727. Second, a defendant also may argue that the information she possessed was sufficient for a reasonable person to conclude her actions were lawful. *See Singer v. Maine,* 49 F.3d 837, 844 (1st Cir.1995) (citations omitted).

I cannot conclude that the circumstances surrounding Dooley's testimony were extraordinary enough to justify disciplinary targeting of her constitutionally protected speech. Nor can I conclude that the information possessed by defendants at the time was sufficient for a reasonable person to conclude their actions were consistent with the First Amendment. Assuming that defendants held only the facts set forth in the Internal Affairs memorandum and the addendum, they should have known that they were dealing with a heavily protected brand of speech; subpoenaed, reasonably reliable courtroom testimony. *See Pro,* 81 F.3d at 1291. At the time of the discipline, defendants should have known better than to discipline her for the content of that speech, or at least investigated the matter further before deciding to do so.

Accordingly, I conclude that the individual defendants are not entitled to qualified immunity.

### Municipal Liability

■■ Plaintiff also claims that the City of Philadelphia is liable for violating her First Amendment rights. In *Monell v. City of New York Dept. of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality may not be held liable for the unconstitutional acts of a state actor unless the conduct that caused the harm was caused by a government policy, custom, or practice. While the clearest cases of municipal liability will involve formal, official government action, as in *Monell,* municipal liability also can arise out of a widespread, longstanding, informal custom or policy, *see Monell,* 436 U.S. at 691, 98 S.Ct. 2018, or through the decisions of officials with policymaking authority, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). It is the last approach that plaintiff takes in this action.

■■ *Pembaur*-style liability is established when a "decisionmaker possesses final authority to establish municipal policy with respect to the action ordered" acts in a manner that violates a constitutional right. *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292. A single decision by such a decisionmaker may establish municipal liability; *Pembaur,* for instance, involved a single decision of a county prosecutor to authorize an unconstitutional entry into the plaintiff's clinic. The authority of a decisionmaker is determined by reference to the laws and regulations of the state or municipality. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915,

99 L.Ed.2d 107 (1988). If the relevant policymaker and the policy are established, a plaintiff still must demonstrate that the policy caused the constitutional injury, *see Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990), and "that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■■■■ Defendant Timoney, Commissioner of the Philadelphia Police Department, is a relevant policymaker. The Court of Appeals for the Third Circuit has made it clear that the commissioner of the Philadelphia Police Department is an official policymaker for the purpose of assessing municipal liability. *See Keenan v. City of Philadelphia*, 983 F.2d 459, 468 (3d Cir.1993) ("In this case, the district court correctly determined that Police Commissioner Tucker was an official policymaker."); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1481 (3d Cir.1990) ("Tucker, as Police Commissioner, was a policymaker."). District courts have found Timoney himself to be a policymaker. *See Miles v. City of Philadelphia*, No. 98–5837, 2001 WL 392878, 2001 U.S. Dist. LEXIS 4736, at *33 (E.D.Pa. April 10, 2001); *Martin v. City of Philadelphia*, No. 99–543, 2000 WL 1052150, *6–*7, 2000 U.S. Dist. LEXIS 10242, at *21–22 (E.D.Pa. July 24, 2000). There is no question that, as a matter of law, Timoney had sufficient policymaking authority to qualify under the *Pembaur* analysis of municipal liability.[33]

■■■ The policy alleged by plaintiff is a decision of Timoney to discipline her for giving subpoenaed, truthful in-court testimony. Timoney himself confirms this allegation in numerous ways. Timoney testified at his deposition, "I believe her testimony should have resulted in her being fired." (Timoney Deposition, at 82.) He stated that he considered Dooley's subpoenaed testimony inappropriate and "outrageous," regardless of whether it was true or not, because it publicly besmirched the reputations of two police officers. (*Id.* at 85–86.) Timoney testified that he thought discipline was appropriate, even if plaintiff had believed her testimony was accurate, observing,

> When we were talking earlier I said the statements that she made were found to not be true. Now, did she realize they were not true and intentionally, that would be a lie, or did she just make a misstatement. I don't know that we'll ever know that, but clearly, the statements she said regarding the officers were not sustained.

(*Id.* at 108, 109).[34] Timoney also signed the disciplinary documents that, on their face, punish Dooley for testifying at Vassallo's trial. (Exh. 20 to Plaintiff's Motion for Partial Summary Judgment, Memorandum on Penalty Recommendation for Jeanette Dooley, April 4, 2000; Exh. 21, Notice of Suspension of Jeanette Dooley.)

■■■ The facts are not in dispute here. Timoney's deposition testimony proves that, as a policymaker, he made a con-

---

**33.** Plaintiff also suggests that Timoney's deputy, John Norris, had sufficient policymaking authority to be a policymaker under *Pembaur*. However, *Pembaur* instructs me to look to the law to determine policymaking status, and I can find no law suggesting that a deputy police commissioner may make policy for the Philadelphia Police Department.

**34.** I note that Timoney's deposition testimony does not square with the addendum to the Internal Affairs report, which was before Timoney when he made his decision to suspend Dooley, and casts considerable doubt on the alleged inaccuracy of Dooley's testimony. (Exh. 34 to Plaintiff's Motion for Summary Judgment, Addendum to IAD # 98–1179, Sept. 3, 1999, at 2–3.)

scious decision to punish a police officer for presenting what she believed to be truthful testimony while under subpoena. The documentary evidence leaves no question that Dooley was disciplined by Timoney because of her protected testimony. I conclude that Timoney's testimony and the documentary evidence evinces deliberate indifference to Dooley's First Amendment right to testify, and it is unquestionable that Timoney's decision caused plaintiff's five-day suspension. Accordingly, I conclude, under *Pembaur*, that there is no a genuine issue of material fact as to whether the City of Philadelphia had a policy of disciplining officers for testifying truthfully pursuant to a subpoena because of the content of their testimony, and plaintiff is entitled to judgment as a matter of law against the City of Philadelphia for her five-day suspension. There remain genuine issues of material fact as to whether her transfer and additional 10 days of suspension, both of which were authorized by Timoney, were motivated by her testimony, and therefore the motions of both parties will be denied as to municipal liability on those issues. Summary judgment will be granted in favor the City of Philadelphia as to all other alleged adverse actions, including the June 1 reprimand, the refusal to transfer her out of Night Command, and others as alleged in plaintiff's complaint. (Complaint, at ¶¶ 28–33, 37, 41(i)–(iii), (v)–(viii), 45).

### Conspiracy Under 42 U.S.C. §§ 1985 and 1986

■■■■ Plaintiff claims that defendants conspired against her in retaliation for her exercise of her First Amendment rights in violation of 42 U.S.C. §§ 1985 and 1986.[35] Section 1985 has three separate sections, but plaintiff is proceeding only under the second section, which provides a cause of action when

> ... two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United Sates from attending such court, or from testifying to any matter pending therein, freely fully, and truthfully, or to injure such party or witness in his person or property on account of his having attended or testified....

42 U.S.C. § 1985(2).[36] Thus, the key elements of a claim under § 1985(2) are: (1) a conspiracy between two or more persons [37] (2) to deter a witness by force, intimidation, or threat from attending federal court or testifying freely in a matter there pending, which (3) causes injury to the

**35.** Plaintiff pleads in the §§ 1985 and 1986 count of her complaint that defendants violated her rights under the First, Fourth, Fifth, and Fourteenth amendments. In her brief, however, she does not make any arguments under the Fourth and Fifth amendments, nor does she adduce evidence that her right to be free from unreasonable searches and seizures or her right not to incriminate herself or any other right under those amendments were violated. Because I have concluded only that her First Amendment rights, as applied to state and local governments through the Fourteenth Amendment, are at issue in this case, I do not address the Fourth and Fifth amendments.

**36.** Defendants also argue that plaintiff has no claim under § 1985(3), but plaintiff makes clear she is proceeding only under § 1985(2) in her response, and therefore I need not address § 1985(3).

**37.** A conspiracy involves "a combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." *Fioriglio v. City of Atlantic City*, 996 F.Supp. 379, 385 (D.N.J.1998) (citing *Darr v. Wolfe*, 767 F.2d 79, 80 (3d Cir.1985); *Ammlung v. City of Chester*, 494 F.2d 811, 814 (3d Cir.1974)).

claimant. *See Rutledge v. Arizona Bd. of Regents*, 859 F.2d 732, 735 (7th Cir.1988).

Defendants challenge plaintiff's conspiracy claim under § 1985 on three grounds. First, defendants argue that her claims are barred by the intracorporate conspiracy doctrine. Second, defendants contend that plaintiff has no standing under § 1985(2). Third, defendants claim that plaintiff cannot satisfy the requisite elements of § 1985.

 The intracorporate conspiracy doctrine posits that a conspiracy cannot exist between an officer of a corporation and the corporation itself. *See Robison v. Canterbury Village, Inc.*, 848 F.2d 424, 431 (3d Cir.1988) (citing cases). This doctrine is inapposite here because plaintiff does not allege that any of the defendants conspired with the City of Philadelphia. She simply alleges that the individual defendants conspired among themselves against her. (Complaint, at ¶ 57.)[38] This kind of conspiracy is precisely what the Court of Appeals for the Third Circuit ruled actionable under § 1985 in *Novotny v. Great American Federal Sav. & Loan Assoc.*, 584 F.2d 1235 (3d Cir.1978), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), a case relied upon by the defendants. *See Robison*, 848 F.2d at 431 ("*Novotny* is inapposite, as we held there only that officers and directors of a corporation can conspire with each other for purposes of section 1985(3)...."). Therefore, defendants' intracorporate conspiracy argument is inapplicable here.

 Defendants assert that § 1985(2) protects only party witnesses, and because Dooley was not a party to the trial she testified in, she has no standing under § 1985(2). Plaintiff properly points out that the Court of Appeals for the Third Circuit has answered this question already, holding in *Heffernan v. Hunter*, 189 F.3d 405 (3d Cir.1999) that "a witness or juror may be a 'party' entitled to maintain an action under section 1985(2)." *Id.* at 410. Therefore, I conclude that plaintiff, as a witness at a federal criminal trial, has standing to bring suit under § 1985(2).

 Turning to the merits of the § 1985 claim, there is *prima facie* evidence that Timoney participated in a conspiracy in violation of § 1985(2). First, Timoney accepted the allegations set forth in the Internal Affairs memorandum signed by Mark Jones, the commanding officer of the Internal Affairs Department. (Exh. 17 to Plaintiff's Motion for Partial Summary Judgment, Memorandum on Internal Investigation, IAD # 98–1179, October 19, 1998.) That memorandum concluded that Dooley had engaged in conduct unbecoming an officer when she testified at the trial of Vassallo. (*Id.* at 13.) The penalty memorandum Timoney signed directly referenced the Internal Affairs investigation and accepted the recommendations of Deputy Commissioner Robert J. Mitchell, who suggested a ten-day suspension for Dooley's testimony. (Exh. 20, Memorandum on Penalty Recommendation for Jeanette Dooley, April 4, 2000.) The notice of suspension signed by Timoney relied in part on an FBI report about Dooley's testimony, which was prepared by FBI personnel. (Exh. 21 to Plaintiff's Motion for Partial Summary Judgment, Notice of Suspension of Jeanette Dooley.) Timoney himself testified at his deposition that he relied on the

---

**38.** The Complaint reads:

The Defendants, acting individually and in their capacities as supervisory and administrative officials of the City and its Police Department, conspired, planned, and agreed with each other to violate the rights of the Plaintiff, and to retaliate against, harass, intimidate, and cause economic and psychological injury to the Plaintiff.

(Complaint, at ¶ 57.)

Internal Affairs report "[a]nd the FBI and a whole host of other sources" in deciding to discipline Dooley for her testimony. (Timoney Deposition, at 84.)

This evidence conclusively demonstrates that Timoney agreed with and relied upon a number of other individuals in taking a course of action that punished Dooley solely because of her exercise of a right that I have concluded was protected under the First Amendment. While it appears to have been largely a paper conspiracy, it was a conspiracy nonetheless. The nexus between the conspiracy and plaintiff's testimony is on the face of the disciplinary documents. And plaintiff was suspended for five days without pay, and therefore suffered an injury. I conclude that the evidence on this point is so one-sided on this claim that plaintiff is entitled to judgment as a matter of law against Timoney. Therefore, plaintiff's motion for summary judgment will be granted as to the § 1985(2) conspiracy claim against Timoney, and Timoney's motion for summary judgment on this count will be denied.

As under the § 1983 claim, there is some evidence that Norris conspired with others to retaliate against plaintiff for her testimony. This evidence takes the form of Norris' approval of the Internal Affairs memorandum that led to Dooley's suspension. (Exh. 17 to Plaintiff's Motion for Partial Summary Judgment, Complaint Routing Slip; Norris Deposition, at 115, 141.) The evidence is not conclusive, however, and therefore, both parties' summary judgment motions will be denied as to Norris' liability under § 1985(2). There is also evidence that de-

fendant Zappile conspired with a fellow deputy commissioner, George Craig, to have Dooley transferred. (Exh. A to Plaintiff's Response to Defendant's Motion for Summary Judgment, Deposition of Richard A. Zappile, Oct. 4, 2000, at 16.) Zappile testified at his deposition that he approached Craig upon reading newspaper accounts of Dooley's testimony and discussed transferring Dooley out of Civil Affairs during the Internal Affairs investigation. (Id. at 17, 22.) Within a few months of this conversation taking place, Dooley was transferred. A reasonable jury could find from this evidence that there was an agreement between Zappile and at least one other individual to discipline Dooley for her testimony. However, the evidence is not overwhelming. Therefore the motions for summary judgment of both parties will be denied on plaintiff's § 1985(2) claim arising out of her transfer.

Section 1986 establishes a cause of action against individuals who have "knowledge of any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, an having the power to prevent or aid in preventing commission of the same, neglect[ ] or refuse[ ] to do so." 42 U.S.C. § 1986. Section 1986 claims can stand only where there is a violation of § 1985. Section 1986 "constitutes an additional safeguard for those rights protected under 42 U.S.C. § 1985. . . ." *Clark v. Clabaugh,* 20 F.3d 1290, 1295 (3d Cir.1994) by providing a cause of action against those with knowledge of, and the power to stop, a § 1985 violation.[39]

---

**39.** According to the Court of Appeals for the Third Circuit,

A § 1986 plaintiff must show that: (1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing

the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed.

*Clark,* 20 F.3d at 1295.

I have concluded that defendant Timoney is liable under § 1985(2), and Timoney cannot, therefore, also be liable under § 1986 because, "§ 1986 is not directed toward the person who causes a § 1985 violation." *See Clark*, 20 F.3d at 1298. Zappile could, at trial, be found liable under § 1985(2), and if he is, he may not also be found liable under § 1986, but if he were found not liable under § 1985, there is enough evidence for a reasonable jury to find him liable under § 1986. However, the evidence does not establish a genuine issue of material fact as to the liability of Norris or Small under § 1986, because plaintiff has not adduced evidence that either Norris or Small had the power to stop her suspension or transfer. Therefore, judgment will be granted in favor of Timoney, Norris, and Small on plaintiff's § 1986 claims, but denied as to Zappile.

### *Pennsylvania Constitution*

Plaintiff claims that defendants violated her right to free speech under the Pennsylvania Constitution, Article I, section 7, which provides in pertinent part:

The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

Pennsylvania has no statute akin to 42 U.S.C. § 1983 that authorizes lawsuits based on violations of the Pennsylvania Constitution, and thus, it is not clear that plaintiff has any claim for a violation of constitutional rights under the Pennsylvania Constitution. The Supreme Court of Pennsylvania has not decided whether a private cause of action exists under Article 1, Section 7 of the Pennsylvania Constitution.

Courts of this circuit that have considered the question have concluded that Article 1, Section 7 does not establish a private cause of action for damages. *See Sabatini v. Reinstein*, No. 99–2393, 1999 WL 636667, 1999 U.S. Dist. LEXIS 12820, at *6 (E.D.Pa. Aug. 18, 1999); *Holder v. City of Allentown*, No. 91–240, 1994 WL 236546, *3, 1994 U.S. Dist. LEXIS 7220, at *11 (E.D.Pa. May 19, 1994); *Lees v. West Greene School Dist.*, 632 F.Supp. 1327, 1335 (W.D.Pa.1986); *Pendrell v. Chatham College*, 386 F.Supp. 341, 344 (W.D.Pa. 1974); *see also Chantilly Farms, Inc. v. West Pikeland Twp.*, No. 00–3903, 2001 WL 290645, *12, 2001 U.S. Dist. LEXIS 3328, at *39 (E.D.Pa. Mar. 23, 2001) (citations omitted). I agree with this line of cases and adopt its reasoning. Accordingly, I conclude that defendants are entitled to judgment as a matter of law on Dooley's claim under the Pennsylvania Constitution.

### *Pennsylvania Criminal Statute 18 Pa. C.S. § 4953*

Plaintiff also brings a claim under 18 Pa.C.S. § 4953, which appears in the Pennsylvania Criminal Code and provides:

§ 4953 **Retaliation against witness or victim**

(a) **Offense defined.**—A person commits an offense if he harms another by any unlawful act in retaliation for anything lawfully done in the capacity of witness or victim.

(b) **Grading.**—The offense is a felony of the third degree if the retaliation is accomplished by any of the means specified in section 4592(1) through (5) (relating to intimidation of witnesses or victims). Otherwise the offense is a misdemeanor of the second degree.

Despite the fact that § 4593 is unquestionably a criminal statute and contains no indicia of a private right of action, plaintiff maintains that she may bring a civil cause of action for damages under this statute.

Plaintiff's argument deserves high marks for creativity, but low marks on legal merit.

Plaintiff asserts that the Superior Court of Pennsylvania considered reading a civil remedy into a criminal statute in *Alfred M. Lutheran Distribs. v. A.P. Weilersbacher, Inc.*, 437 Pa.Super. 391, 650 A.2d 83 (1994), and urges this Court to follow suit. What plaintiff neglects to mention is that the Superior Court rejected the contention that a civil remedy could be found in the criminal statute. *Alfred M. Lutheran* involved a Pennsylvania Liquor Code provision. The Superior Court engaged in an exhaustive analysis of the legislature's intent in drafting the statute and concluded that despite the presence of private rights of action elsewhere in the Liquor Code, and despite the fact that plaintiff fell within the class intended to be protected by the statute, there was no private cause of action to be found. *See id.* at 412, 650 A.2d 83. The analysis here is much simpler; nothing in the criminal code evinces a legislative intent to create a civil remedy for retaliation. Under plaintiff's analysis, every criminal statute could be read to create a civil cause of action.

Plaintiff argues that because another Pennsylvania retaliation statute located under a completely different subtitle—49 Pa.C.S. § 4957—expressly established a civil remedy in cases where an employer takes adverse action against an employee who is a witness or victim of a crime, a private right of action should be inferred from the criminal retaliation statute. I draw the opposite conclusion; the fact that the Pennsylvania legislature chose to create an express civil remedy in the form of 49 Pa.C.S. § 4957 against employers for retaliation leads me to believe that the

legislature's choice not to include such a remedy in 18 Pa.C.S. § 4593 was a deliberate one. *See Alfred M. Lutheran*, 650 A.2d at 89. ("As made plain by these other statutes, the General Assembly clearly knows how to draft legislation so as to grant an individual the right to maintain a private statutory cause of action. The fact that a similar provision has been omitted from the Liquor Code strongly suggests that the General Assembly has not seen fit to allow private statutory causes of action to be brought thereunder.").[40]

I have neither the inclination nor the authority to transform a criminal statute into a civil cause of action. Therefore, judgment as a matter of law will be granted in favor of defendants on plaintiff's § 4593 claim.

### 5. Intentional Infliction of Emotional Distress

 Plaintiff claims the defendants have committed the tort of intentional infliction of emotional distress. Though the question has been presented numerous times, the Supreme Court of Pennsylvania has yet to declare whether a cause of action for intentional infliction of emotional distress is viable in Pennsylvania. *See Taylor v. Albert Einstein Medical Center*, 562 Pa. 176, 181, 754 A.2d 650 (2000); *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 185, 527 A.2d 988 (1987); *Hoy v. Angelone*, 554 Pa. 134, 151 n. 10, 720 A.2d 745 (1998). Nevertheless, the Supreme Court of Pennsylvania has assumed *arguendo* that such a tort exists, and the Court of Appeals for the Third Circuit has held that pending a clear statement from the Supreme Court of Pennsylvania, the rule in this circuit is that the tort of intentional infliction of emotional distress is via-

---

**40.** Moreover, plaintiff's reference to the civil remedy in 49 Pa.C.S. § 4957 begs the question of why plaintiff is not proceeding under that statute instead of trying to fashion a novel remedy out of a criminal statute.

ble in Pennsylvania. *See Williams v. Guzzardi*, 875 F.2d 46, 51 (3d Cir.1989) (citing *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979)). Therefore, I will assume for the purpose of analysis that the tort of intentional infliction of emotional distress is alive and well in Pennsylvania.

█ Insofar as it has considered the tort of intentional infliction of emotional distress, the Supreme Court of Pennsylvania has relied on the definition set forth in Section 46 of the Restatement (Second) of Torts, which provides:

### § 46 Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

 (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

 (b) to any other person who is present at the time, if such distress results in bodily harm.

In order to state a cognizable claim, the conduct must be "so extreme in nature as to go beyond all possible bounds of decency such that it would be regarded as utter-

ly intolerable to civilized society." *Mulgrew v. Sears Roebuck & Co.*, 868 F.Supp. 98, 103 (E.D.Pa.1994). The Supreme Court of Pennsylvania has determined that " 'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.' " *Hoy*, 554 Pa. at 152, 720 A.2d 745 (quoting *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir.1988)).[41]

I conclude that defendants' conduct, while upsetting to Dooley and troubling from a constitutional standpoint, was not beyond the bounds of human decency or utterly intolerable in human society. Even if this Court were to attribute nefarious motives to defendants, no reasonable jury could find that defendants' conduct was outrageous enough to constitute intentional infliction of emotional distress. Therefore, defendants' motion for summary judgment as to plaintiff's claim for intentional infliction of emotional distress will be granted.

### *Conclusion*

A court of appeals once observed that "while it is sometimes true that police officers' rights are more limited than that of others, freedom of speech is not traded for an officer's badge." *Biggs v. Village of Dupo*, 892 F.2d 1298, 1303 (7th Cir.1990). Despite the fact that she was a police officer, Jeanette Dooley had a robust right under the First Amendment to appear in federal court pursuant to a subpoena and to present what she believed to be truthful testimony, and that is what she did. The

---

**41.** The Superior Court of Pennsylvania has found that retaliatory *termination* for reporting an employer's wrongful conduct does not, without more, demonstrate the requisite level of outrageousness. *See McLaughlin v. Gastrointestinal Specialists, Inc.*, 696 A.2d 173, 176 (Pa.Super.1997), *aff'd*, 561 Pa. 307, 750

A.2d 283 (2000). In contrast, Dooley was not even terminated; she was suspended for 15 days and transferred. Viewing the evidence in the light most favorable to the plaintiff, I cannot conclude that a reasonable jury could find in her favor on her claim of intentional infliction of emotional distress.

interest of the Philadelphia Police Department in promoting efficiency and preventing disruption was not sufficient to justify disciplining her for her protected testimony. Therefore, plaintiff will prevail on part of her motion for summary judgment, and a trial will be held on the claims that remain.

An appropriate Order follows.

### ORDER

**AND NOW,** this 4th day of June, 2001, upon consideration of the motion of plaintiff for partial summary judgment (Document No. 30) and the motion of defendants for summary judgment (Document No. 31), having reviewed the record and the pleadings as required under Rule 56 of the Federal Rules of Civil Procedure, and having concluded, for the reasons set forth in the foregoing memorandum, as to some claims there are no genuine issues of material fact and plaintiff and defendants are entitled to judgment as a matter of law and as well, that there remain some genuine issues of material fact, **IT IS HEREBY ORDERED** that:

(1) plaintiff's motion for partial summary judgment is **GRANTED** as to liability only against defendants City of Philadelphia and Timoney, on her claim under 42 U.S.C. § 1983 for retaliation in violation of her First Amendment rights as to her five-day suspension;

(2) plaintiff's motion for partial summary judgment is **DENIED** as to all other claims against all other defendants;

(3) defendants' motion for summary judgment is **DENIED** as to plaintiff's claim against the City for a violation of § 1983 arising out of her transfer and her 10–days of suspension; **DENIED** as to her claims against Timoney for a violation of § 1983 arising out of her transfer and her 10–days of suspension and transfer; **DENIED** as to her claims against Norris for a violation of § 1983 and § 1985 arising out of her suspension only; and **DENIED** as to her claims against Zappile for violations of §§ 1983, 1985, 1986 arising out of her transfer; and

(4) defendants' motion is **GRANTED**

(a) in favor of the City of Philadelphia under § 1983 as to the adverse employment actions complained of in paragraphs 28–33, 37, 41(i)–(iii), (v)–(viii), and 45 of the Complaint; under §§ 1985 and 1986; and under all state-law claims for relief;

(b) in favor of defendant Timoney under §§ 1983 and 1985 as to the adverse employment actions complained of in paragraphs 28–33, 37, 41(i)–(iii), (v)–(viii), and 45 of the Complaint; under § 1986; and under all state-law claims for relief;

(c) in favor of defendant Norris under §§ 1983, 1985 and 1986 as to the adverse employment actions complained of in paragraphs 28–33, 37, 41, and 45 of the Complaint, and under all state-law claims for relief;

(d) in favor of defendant Zappile under §§ 1983, 1985, and § 1986 as to the adverse employment actions complained of in paragraphs 28–33, 37, 41(i)–(iii), (v)–(viii), and 45 of the Complaint; and under all state-law claims for relief;

(e) in favor of defendant Small as to all claims for relief.